**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**ST. MARY MEDICAL CENTER,** *et al.*,

        *Plaintiffs*,

    **v.**

**XAVIER BECERRA,**

        *Defendant*.

Civil Action No. 17-1073 (FYP)

---

## <u>MEMORANDUM OPINION</u>

Plaintiffs are California hospitals that receive payments from the federal government to treat patients who are on Medicare.  The hospitals bring this suit to challenge the Secretary of Health and Human Services' interpretation of Section 4410 of the Balanced Budget Act of 1997 — an interpretation that lowered Plaintiffs' Medicare payments in fiscal years 2009 and 2010. Section 4410 requires the Secretary to apply an adjustment that increased the Plaintiff hospitals' Medicare payments — the so-called "rural-floor adjustment;" but the Secretary then decreased the payments by applying a corresponding "budget-neutrality" provision.  Plaintiffs contend that their Medicare payments should not have been decreased under the budget-neutrality provision. They assert that the Secretary's interpretation of that provision violates the plain language of the statute and is unreasonable; and that the regulations adopted by the Secretary to determine the hospitals' payments in 2009 and 2010 violate the Administrative Procedure Act, *see* 5 U.S.C. § 500 *et seq.*  Before the Court are the parties' dueling motions for summary judgment.  For the

reasons set forth below, the Court will deny Plaintiffs' Motion for Summary Judgment and will grant Defendant's Cross Motion for Summary Judgment.[1]

## BACKGROUND

### I. Statutory Framework

#### A. Medicare and the Wage Index

Medicare is a federal health insurance program for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq.* It is administered by the Centers for Medicare & Medicaid Services ("CMS") within the Department of Health and Human Services ("HHS"). Medicare Part A "covers medical services furnished by hospitals and other institutional care providers." *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 2 (D.C. Cir. 2011). Under Part A, Medicare pays predetermined rates to most hospitals for treating patients admitted to their care, rather than paying the actual costs of the medical services provided. *See* 42 U.S.C. § 1395ww(d). This system of predetermined rates, which was established in 1983, is known as the Medicare hospital inpatient prospective payment system ("IPPS"). *See* Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149; *see also Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914–15 (D.C. Cir. 2009) (describing IPPS); *Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1021–22 (D.C. Cir. 2000) (same).[2]

---

[1] Two other motions are also before the Court: Defendant's Motion for Summary Judgment against the Plaintiff hospitals in *Bakersfield Memorial Hospital v. Azar*, No. 18-cv-1609, *see* ECF No. 33; and the *Bakersfield* Plaintiffs' Second Motion for Summary Judgement, *see* ECF No. 34. The Court consolidated the *Bakersfield* case with the instant case on August 14, 2018. *See* Minute Order (August 14, 2018). The Plaintiffs in the *Bakersfield* case have joined the instant Plaintiffs' Motion for Summary Judgment in full. *See Bakersfield* Pl. Mot. at 5 ("[T]he [*Bakersfield*] Plaintiffs hereby adopt the Original Plaintiffs' prior briefs at ECF No. 17, 23, and 24."). Defendant has similarly "set forth in his memoranda in support of his cross-motion for summary judgment in *St. Mary Medical Center*, ECF Nos. 20 & 26" his arguments for summary judgment against the *Bakersfield* Plaintiffs. *See Bakersfield* Def. Mot. at 1. Accordingly, this Court's resolution of the instant motions also will resolve the outstanding motions for summary judgment in the *Bakersfield* case.

[2] "Hospitals that participate in the [IPPS] are called 'subsection (d) hospitals,' named after the statutory subsection that identifies them." *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 2 (D.C. Cir. 2009) (citing 42 U.S.C. § 1395ww(d)(1)(B)). "These facilities are best described as 'short-term acute care general hospitals.'" *Id.* (quoting *Transitional Hosps.*, 222 F.3d at 1021). Not all hospitals participate in the IPPS.

To calculate payments to hospitals under the IPPS, CMS follows three steps.  The agency (1) constructs a standard nationwide cost rate, which roughly reflects the average cost incurred by hospitals nationwide for each patient they treat;[3] (2) determines the proportion of that standardized amount attributable to wages and wage-related costs; and (3) multiplies that labor-related proportion by a wage index that adjusts for local hospital wages as compared to their federal benchmark.  *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205–06 (D.C. Cir. 2011); 42 C.F.R. § 412.64(g).

The second and third steps of this process reflect the requirement that the Secretary "adjust the 'proportion' of the payment attributable to 'wages and wage-related costs' for 'area differences in hospital wage levels.'"  *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1158 (D.C. Cir. 2015) (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i)).  "To ensure uniformity in the adjustment process, the [Medicare] statute requires the Secretary to compute a 'factor' that 'reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average;'" this factor is commonly referred to as the "wage index."  *Id.* (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i)).  In calculating each region's wage index, the Secretary divides the regional average hourly wage rate for hospitals in the defined geographic area by the national average hourly wage rate.  *Anna Jacques Hosp.*, 797 F.3d at 1159; 42 C.F.R. § 412.64(h).  "A wage index of 1.0 means a given area is average; an index above 1.0 indicates higher than average wage costs . . . [;] and an index below 1.0 means a lower than average cost area."  *Dignity Health v. Price*, 243 F. Supp. 3d 43, 46 (D.D.C. 2017).  The wage index is applied as an

---

[3]     "Medicare authorities . . . construct a standard nationwide cost rate — the 'federal rate' — based on the average operating costs of inpatient hospital services."  *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).  "They then assign a weight to each category of inpatient treatment, or 'diagnosis-related group.'"  *Id.*  The diagnosis-related group to which a patient is assigned upon discharge determines how much the hospital is paid for treating her.  *See County of Los Angeles v. Shalala*, 192 F.3d 1005, 1008–09 (D.C. Cir. 1999); *Methodist Hosp.*, 38 F.3d at 1227.

adjustment to wage-related costs, altering the payments received by a hospital in a fiscal year. This method ensures that, for example, hospitals in Los Angeles, California, receive higher payments than hospitals in rural Kansas, to account for the comparatively more expensive labor market in urban California.

B.   The Rural-Floor and the Budget-Neutrality Adjustment

Congress has made an exception to the general rule that each hospital's wage index is based on the prevailing wages in its own geographic area.  In Section 4410(a) of the Balanced Budget Act of 1997, Congress included a provision that raises the wage index of urban hospitals with low wages to the same level as the wage index in rural areas of the same state:

> [T]he area wage index applicable . . . to any hospital which is not located in a rural area . . . may not be less than the area wage index applicable under such section to hospitals located in rural areas in the State in which the hospital is located.

See Balanced Budget Act of 1997 ("BBA 1997"), Pub. L. No. 105-33, § 4410(a), 111 Stat. 251, 402.  Known as the "rural floor," this provision guarantees that all hospitals in a state receive at least the wage index applicable to the rural hospitals in that state.  *See Cape Cod Hosp.*, 630 F.3d at 206; FFY 2009 Final Rule, 73 Fed. Reg. 48,434, 48,570 (Aug. 19, 2008) ("Section 4410 . . . established the rural floor by requiring that the wage index for a hospital in an urban area of a State cannot be less than the area wage index received by rural hospitals in that State.").

Concerned about the increased costs associated with applying the rural floor to raise Medicare payments to certain urban hospitals, Congress also enacted a budget-neutrality adjustment to offset the increased payments.  *See Cape Cod Hosp.*, 630 F.3d at 206. Specifically, the budget-neutrality provision in Section 4410(b) of the 1997 Act states:

> The Secretary of Health and Human Services shall adjust the area wage index referred to in subsection (a) for hospitals not described in such subsection in a manner which assures that the aggregate payments made

4

> . . . in a fiscal year for the operating costs of inpatient hospital services
> are not greater or less than those which would have been made in the
> year if this section did not apply.

*See* BBA 1997 § 4410(b).  Thus, taken as a whole, subsection (a) of Section 4410 increases

Medicare payments to certain urban hospitals through application of the rural-floor adjustment;

and subsection (b) of the statute decreases Medicare payments to other hospitals so that the rural-

floor provision remains budget neutral.

To effectuate the requirements of Section 4410, the Secretary must calculate the wage

indices for three categories of hospitals:  (1) rural hospitals; (2) urban hospitals that do not

receive the rural floor, *i.e.*, high-wage urban hospitals; and (3) urban hospitals that do receive the

rural floor, *i.e.*, low-wage urban hospitals.  The budget-neutrality provision requires a downward

adjustment of payments to hospitals "not described" in subsection (a) to offset the rural-floor

adjustments paid to low-wage urban hospitals.  In applying that provision, the Secretary has

defined hospitals "not described" in subsection (a) as rural hospitals and high-wage urban

hospitals.  *See* FFY 2008 Final Rule, 72 Fed. Reg. 47,130, 47,325 (Aug. 22, 2007).  He has

considered two ways to apply the cost of budget neutrality to those hospitals.

According to the Secretary, "[o]ne possible interpretation of section 4410(b) of the BBA

is that the budget neutrality adjustment would be applied only to [the wage indices of] those

hospitals that do not receive the rural floor," *i.e.*, rural hospitals and high-wage urban hospitals.

*Id.*  "In other words, the wage index of an urban hospital subject to the rural floor would be

increased to the level of the rural wage index in the same State, but would not be adjusted for

budget neutrality."  *Id.*  The Secretary expressed concern, however, that under this approach,

"urban hospitals receiving the rural floor would receive a higher wage index than the rural

hospitals within the same State (because rural floor hospitals would not be subject to budget

neutrality, whereas rural hospitals would be)." *Id.*  The Secretary concluded that "such a reading would not be in accordance with Congressional intent, which was to set a floor for urban hospitals, not to pay urban hospitals a wage index higher than the wage index applicable to rural hospitals." *Id.*

To better vindicate Congress's intent, the Secretary considered and adopted a second way to apply the statute, which "allow[s] an iterative calculation of budget neutrality and wage indices." *Id.*  Under the iterative method, the Secretary first raises the wage indices of low-wage urban hospitals to match the rural hospitals for their geographic area, thereby applying the rural floor. *Id.*  This results in an overall Medicare budget increase, which is prohibited by Section 4410(b); to maintain budget neutrality, the Secretary then applies an overall budget-neutrality downward adjustment to the wage indices of rural and high-wage urban hospitals. *Id.*  At this point, the wage indices of low-wage urban hospitals are higher than the wage indices of rural hospitals, requiring the Secretary to reset the rural floor, and allowing the Secretary to then decrease the wage indices of low-wage urban hospitals to match the lower rate now applied to rural hospitals. *Id.*  "At this point, payments would be less in the aggregate," again violating the budget-neutrality requirements of Section 4410(b). *Id.*  Accordingly, the Secretary then applies an upward budget-neutrality adjustment to the wage indices of rural and high-wage urban hospitals, and then resets the rural floor to this new amount. *Id.*  The low-wage urban hospitals' rate is then adjusted to the new rural floor.  This iterative process continues until the calculation stabilizes at the point where the system is budget neutral, and the wage indices of low-wage urban hospitals are equal to those of rural hospitals. *Id.*; *see also id.* at 47,326–29 (calculating nine iterations with a simplified model).

Because this iterative process is resource intensive, the Secretary has further "determined that the iterative method is substantively equivalent to simply adjusting all area wage indices by a uniform percentage." *Id.* at 47,325. He has adopted that simplified methodology since federal fiscal year ("FFY") 2008.[4] Before 2009, the uniform adjustment rate that approximates the iterative method was applied nationwide, thereby spreading the cost of budget neutrality across hospitals throughout the country. *See* 72 Fed. Reg. at 47,325 (describing nationwide method in FFY 2008); FFY 2009 Proposed Rule, 73 Fed. Reg. 23,528, 23,620 (Apr. 30, 2008) (noting that prior to FFY 2009, "a nationwide budget neutrality adjustment" was applied). Because the adjustment was spread so broadly, the adjustment to each hospital's payments was relatively small. *See* ECF No. 17 (Plaintiffs' Motion for Summary Judgment) at 7.

C.    The In-State Budget-Neutrality Adjustment

For FFY 2009, the Secretary decided to modify the budget-neutrality adjustment. He proposed an in-state budget-neutrality adjustment, so that each state's hospitals would become responsible for the costs of the rural floor in that state, rather than spreading the cost of the rural floor across hospitals nationwide. *See* 73 Fed. Reg. at 23,622–23. Under this system, the iterative method would be performed within each state with low-wage urban hospitals that benefitted from the rural floor, rather than across all hospitals nationally.[5]

The Secretary gave two reasons for this change. First, he noted that "at a State-by-State level, the rural floor is creating a benefit for a minority of States that is . . . funded by a majority

---

[4]    Following passage of the Balanced Budget Act of 1997, the Secretary implemented the requirements of Section 4410 by applying the rural floor budget-neutrality adjustment to the standardized amount rather than the wage index. *See* 72 Fed. Reg. at 47,325. Starting in FFY 2008, the Secretary applied the rural floor budget-neutrality adjustment to all hospitals' wage indices rather than to the standardized amount. *Id.* at 47,329.

[5]    Under the Secretary's proposal, "States that have no hospitals receiving a rural floor wage index would no longer have a negative budget neutrality adjustment applied to their wage indices." *See* 73 Fed. Reg. at 23,622. "Conversely, hospitals in States with hospitals receiving a rural floor would have their wage indices downwardly adjusted to achieve budget neutrality within the State." *Id.* at 23,622–23. "All hospitals within each State would, in effect, be responsible for funding the rural floor adjustment applicable within that specific State." *Id.* at 23,623.

of States, including States that are overwhelmingly rural in character." *Id.* at 23,622.  Although

"[t]he intent behind the rural floor seems to have been to address anomalous occurrences where

certain urban areas in a State have unusually depressed wages when compared to the State's rural

areas," in practice it was serving as a mechanism by which hospitals in the majority of states

subsidized hospitals in a minority of states.  *Id.*  Because, under Section 4410(a), the

comparisons between the wage index of each urban hospital and the index applicable to rural

hospitals "occur at the State level" (*e.g.*, each urban hospital in California compares its wage

index to the index for California's rural hospitals), the Secretary explained that "it also would be

sound policy to make the budget neutrality adjustment specific to the State, redistributing

payments among hospitals within the State . . . , rather than adjusting payments to hospitals in

other States."  *Id.*  Second, the Secretary suggested that the in-state budget-neutrality adjustment

would help to resolve an anomaly in which some rural hospitals were artificially increasing their

state's rural floor.  *Id.*  According to the Secretary, this gaming of the system "would increase

[payments to hospitals in the state] in excess of $220 million in a single year," something the in-

state policy prevented.  *Id.*

      In the FFY 2009 Proposed Rule, the only modification to the Secretary's interpretation of

Section 4410 was the change from a nationwide budget-neutrality adjustment to a state-by-state

budget-neutrality adjustment.  *See* 73 Fed. Reg. at 23,620–23,623; *see also id.* at 48,570–48,574

(final rule adopting no changes other than the in-state adjustment).  As a result, the Secretary's

interpretation from the FFY 2008 rulemaking, describing the iterative method and implementing

it through application of a uniform percentage, remained unchanged and continued to apply in

FFY 2009.  *See* 72 Fed. Reg. 47,325–47,330; *see also FCC v. Fox Television Stations, Inc.*, 556

U.S. 502, 515 (2009) ("An agency may not . . . depart from a prior policy *sub silentio* or simply

disregard rules that are still on the books."); *Mendoza v. Perez*, 754 F.3d 1002, 1020 (D.C. Cir. 2014) ("An agency is generally required by the APA to publish notice of proposed rulemaking in the Federal Register and to accept and consider public comments on its proposal." (citing 5 U.S.C. § 553)).  But under the FFY 2009 Proposed Rule, the simplified version of the iterative method was to be applied on a state-by-state basis, and not on a nationwide basis.

The Secretary's proposal of an in-state adjustment garnered significant public comment, with "the majority of commenters, including most national and State hospital associations, [opposing] the proposal."  *See* 73 Fed. Reg. at 48,573.  In response to concerns that the change would result in "potentially drastic payment cuts," the Secretary "decided to phase in, over a 3-year period, the transition from the national budget neutrality adjustment to the State level budget neutrality adjustment."  *Id.* at 48,574.  In FFY 2009, hospitals would "receive a blended wage index that is 20 percent of a wage index with the State level rural . . . floor budget neutrality adjustment and 80 percent of a wage index with the national budget neutrality adjustment."  *Id.*  In FFY 2010, the wage index would be blended evenly between State-level and national, and in FFY 2011 the adjustment would "be completely transitioned to the State level methodology."  *Id.*  The Secretary codified this policy at 42 C.F.R. § 412.64(e)(4).[6]  Due to

---

[6]      That regulation reads:

> (4) CMS makes an adjustment to the wage index to ensure that aggregate payments after implementation of the rural floor under section 4410 of the Balanced Budget Act of 1997 (Pub. L. 105-33) and, for discharges on or after October 1, 2004, and before October 1, 2018, the imputed floor under paragraph (h)(4) of this section are equal to the aggregate prospective payments that would have been made in the absence of such provisions as follows:
>
>> (i) Beginning October 1, 2008, such adjustment is transitioned from a nationwide to a statewide adjustment as follows:
>>
>>> (A) From October 1, 2008 through September 30, 2009, the wage index is a blend of 20 percent of a wage index with a statewide adjustment and 80 percent of a wage index with a nationwide adjustment.

superseding legislation by Congress that restored the nationwide approach in 2011, however, the state-by-state budget-neutrality adjustment was applied only in FFY 2009 and 2010.[7]

## II.   Facts and Procedural History

Plaintiffs are seventeen hospitals that have benefited from the rural-floor adjustment.  As a result of the FFY 2009 state-wide application of the budget-neutrality adjustment, sixteen of the Plaintiffs allege that their total Medicare reimbursement was reduced "by approximately $2,999,151." *See* ECF No. 1 (Complaint), ¶ 49.  Eight of the Plaintiffs allege that in FFY 2010, they saw a total reduction of "approximately $1,168,158." *Id.*, ¶ 51.  On June 5, 2017, Plaintiffs filed their Complaint in the instant case alleging five claims, one of which has since been resolved[8] and another that has been abandoned.[9]  In their remaining claims, Plaintiffs allege that the Secretary:

---

(B) From October 1, 2009 through September 30, 2010, the wage index is a blend of 50 percent of a wage index with a statewide adjustment and 50 percent of a wage index with a nationwide adjustment.

(ii) Beginning October 1, 2010, such adjustment is a full nationwide adjustment.

*See* 42 C.F.R. § 412.64(e)(4).

[7]     In the Patient Protection and Affordable Care Act ("ACA"), Congress overrode the Secretary's in-state rural floor budget-neutrality adjustment and required the Secretary to apply a uniform, nationwide rural floor budget-neutrality adjustment beginning October 1, 2010.  *See* ACA, Pub. L. No. 111-148, § 3141, 124 Stat. 119, 441 (2010) ("[F]or purposes of applying section 4410 . . . , the Secretary of Health and Human Services shall administer subsection (b) of such section 4410 . . . in the same manner as the Secretary administered such subsection (b) . . . for discharges occurring during fiscal year 2008 (through a uniform, national adjustment to the area wage index).").

[8]     The claim that has been resolved sought to challenge the Provider Reimbursement Review Board's finding that it did not have jurisdiction over three of the hospitals' claims and therefore could not grant those hospitals an expedited judicial review ("EJR").  *See* Compl., ¶¶ 64–67.  During the pendency of this case, the parties agreed to remand this issue to the Board, which found that it did have jurisdiction and granted the hospitals an EJR.  *See* ECF No. 22 (Joint Motion to Remand to U.S. Department of Health and Human Services); ECF No. 35 (Joint Appendix (Supplemental)), at 3463.  The three hospitals then filed a separate Complaint, and their case was ultimately consolidated with the instant case.  *See* Minute Order (August 14, 2018).

[9]     In Count III of their Complaint, Plaintiffs allege that the Secretary violated the Tax Relief and Health Care Act of 2006 by applying the budget-neutrality adjustment statewide despite Congress's intent to "[m]inimiz[e] variations in wage index adjustments between and within Metropolitan Statistical Areas and Statewide rural areas."  *See* Compl., ¶¶ 71–72.  Plaintiffs now state, however, that they "do not contend that the Secretary violated the [Tax Relief and Health Care Act] or that [the] statute was an absolute command to minimize variations."  *See* ECF No. 23 (Plaintiffs' Opposition and Reply) at 16.  Instead, Plaintiffs argue only that the Act "is evidence that the Secretary unreasonably interpreted" Section 4410 because it "shows that Congress was concerned about excessive variations in wage [indices] among states."  *Id.*

(1) Violated Section 4410(b) of the Balanced Budget Act by applying the budget-neutrality adjustment to low-wage urban hospitals and rural hospitals in FFYs 2009 and 2010, despite the explicit exclusion of such hospitals by the language of Section 4410(b), *id.*, ¶ 69;

(2) Violated section 553(b)(3)[10] of the APA by failing to provide sufficient notice of how the Secretary calculated his proposed statewide adjustment, the range of alternatives he considered, and a comparison of wage index values under the existing rule and proposed rule, *id.*, ¶¶ 74–76 (citing 5 U.S.C. § 553(b)(3)); and

(3) Violated sections 553 and 706(2)(A) of the APA[11] by ignoring the concerns raised by commenters on the 2009 and 2010 proposed rules, *id.*, ¶¶ 78–80 (citing 5 U.S.C. §§ 553, 706(2)(A)).

Plaintiffs seek a declaration that "forbids the Secretary" from applying the budget-neutrality adjustment to Plaintiffs.  *Id.* at 26.  Plaintiffs further seek an order requiring the Secretary to recalculate the FFY 2009 and 2010 wage indices and Medicare payments applicable to the Plaintiff hospitals, and an order awarding Plaintiffs fees and costs.  *Id.* at 26–27.

## LEGAL STANDARD

Summary judgment is the appropriate means for determining, as a matter of law, if "agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Hill Dermaceuticals, Inc. v. FDA*, No. 11-cv-1950, 2012 WL

---

[10]     Section 553(b) requires agencies to publish "[g]eneral notice of proposed rulemaking" in the Federal Register.  *See* 5 U.S.C. § 553(b).  The notice must include: "(1) a statement of the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."  *Id.*

[11]     After an agency provides notice of a proposed rulemaking, the agency must "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  Failure to adequately respond to submissions constitutes unlawful action under section 706(2)(A).  *See* 5 U.S.C. § 706(2)(A); *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public." (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977), *cert. denied*, 485 U.S. 959 (1988))).

5914516, at *7 (D.D.C. May 18, 2012) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)).  While the ordinary summary judgment standard is laid out in Federal Rule of Civil Procedure 56, "it is well established that, in cases involving review of a final agency action . . . the standard set forth in Rule 56 does not apply because of the limited role of the court in reviewing the administrative record."  *Otsuka Pharm. Co. v. Burwell*, 302 F. Supp. 3d 375, 389 (D.D.C. 2016), *aff'd sub nom.*, *Otsuka Pharm. Co. v. Price*, 869 F.3d 987 (D.C. Cir. 2017) (cleaned up).  In this context, the function of the agency is "to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)).  In other words, "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and "[t]he entire case on review is a question of law, and only a question of law," *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Notably, "[w]hile the court's review [on summary judgment] must be 'searching and careful, the ultimate standard of review is a narrow one' and the court 'is not empowered to substitute its judgment for that of the agency.'"  *Cape Hatteras Access Pres. All. v. Dep't of Interior*, 731 F. Supp. 2d 15, 21 (D.D.C. 2010) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).  This deferential standard, however, cannot permit courts "merely to rubber stamp agency actions, nor be used to shield the agency's decision from undergoing a thorough, probing, in-depth review."  *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 186 (D.D.C. 2014) (internal quotation marks and citation omitted); *see also Otay Mesa Prop., L.P. v.*

*Dep't of Interior*, 646 F.3d 914, 916 (D.C. Cir. 2011) ("Substantial evidence is a deferential

standard.  But deference is not abdication."); *Huff v. Vilsack*, 195 F. Supp. 3d 343, 352 (D.D.C.

2016) (noting that, even under the deferential standard of review, "courts retain a role, and an

important one, in ensuring that agencies have engaged in reasoned decision-making, which

means the court must ensure that the decision was based on a consideration of the relevant

factors and determine whether there has been a clear error of judgment" (cleaned up)).

## ANALYSIS

Plaintiffs assert that the Secretary's FFY 2009 and 2010 regulations related to the rural-

floor adjustment are illegal for a number of reasons.  First, Plaintiffs contend that the Secretary

unlawfully applied the budget-neutrality adjustment to low-wage urban and rural hospitals, in

contravention of Section 4410.  *See* Pl. Mot. at 18–25.  The statute forbids the Secretary from

applying the budget-neutrality adjustments to hospitals "described" in the rural-floor provision,

*see* BBA 1997 § 4410, and in Plaintiffs' view, both low-wage urban hospitals and rural hospitals

are unambiguously "described" in that subsection.  *See* Pl. Mot. at 19.  Moreover, Plaintiffs

contend that even if the statute is ambiguous, the Secretary's interpretation is unreasonable

because it "undermines Congress's objective of assisting urban hospitals with 'unusually

depressed' wages by forcing the very same hospitals to bear a share of the budget neutrality

adjustment."  *See* Pl. Mot. at 22.  Finally, Plaintiffs argue that, in adopting the FFY 2009 and

2010 regulations, the Secretary failed to comply with the APA's requirements to inform the

public of the impact of the regulations and to adequately account for comments opposing the

policy changes.  *See* Pl. Mot. at 25–32.  The Secretary responds that Section 4410 is ambiguous;

that his reasonable interpretation is entitled to deference under *Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc.*, 467 U.S. 837 (1984); and that he complied with all

requirements of the APA.  *See generally* ECF No. 20 (Defendant's Cross-Motion for Summary

Judgment and Opposition).  The Court considers each argument in turn.

## I.      Application of the Budget-Neutrality Adjustment

According to Plaintiffs, the Secretary's application of the in-state budget-neutrality

adjustment in FFYs 2009 and 2010 is incompatible with the text of Section 4410.  *See* Pl. Mot. at

18–25.  Where, as here, a plaintiff challenges a federal agency's actions as exceeding its

"statutory jurisdiction, authority, or limitations," *see* 5 U.S.C. § 706(2)(C), the Court must apply

the two-step framework of *Chevron,* 467 U.S. 837.  *See Ass'n of Private Sector Colls. & Univs.*

*v. Duncan,* 681 F.3d 427, 441 (D.C. Cir. 2012).

*Chevron* directs that if "Congress has directly spoken to the precise question at issue," the

Court must give effect to that "unambiguously expressed intent."  *Nat'l Treasury Emps. Union v.*

*FLRA*, 414 F.3d 50, 57 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 842–43) (internal

quotation marks omitted).  To determine whether "the intent of Congress is clear" under this first

step of *Chevron*, the Court must exhaust the "traditional tools of statutory construction,"

including textual analysis, structural analysis, and legislative history.  *Chevron*, 467 U.S. at 843

& n.9; *see also Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) ("The

traditional tools include examination of the statute's text, legislative history, and structure; as

well as its purpose." (citations omitted)).  In conducting the requisite analysis, the pertinent

question is not whether the statutory terms at issue are "'in some abstract sense, ambiguous, but

rather whether, read in context and using the traditional tools of statutory construction,' the terms

unambiguously mean what the party claiming victory at Step One says they mean."  *Otsuka*, 302

F. Supp. 3d at 389 (quoting *Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 400 (D.C.

Cir. 2004)).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well

as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

When the statute at issue "can be read more than one way" and is thus properly deemed ambiguous, *AFL–CIO v. FEC*, 333 F.3d 168, 173 (D.C. Cir. 2003) (citation omitted), the Court must proceed to the second step of *Chevron*, wherein such ambiguity or silence is generally considered to be "an implicit delegation from Congress to the agency to fill in the statutory gaps," *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)) (emphasis omitted).  Accordingly, the nature of judicial review at Step Two is "highly deferential," *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 667 (D.C. Cir. 2011), meaning that the court must "accept the agency's [reasonable] construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation," *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (citation omitted); *see also Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1353 (D.C. Cir. 2006) (noting that, at *Chevron* Step Two, the court must defer to the agency's interpretation of a statute if it is "based on a permissible construction of the statute" (citation omitted)).  In sum, "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Ass'n of Private Sector Colls. & Univs.*, 681 F.3d at 441 (citations omitted).

A.    Section 4410 is Ambiguous.

As in all matters of statutory construction, we begin with the plain language of the statute. *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012).[12]  The plain

---

[12]    Under *Chevron*, courts may also consider legislative history when analyzing statutory language at Step One.  *See Sierra Club v. EPA*, 551 F.3d 1019, 1027 (D.C. Cir. 2008).  The parties agree, however, that the "[l]egislative history is no help" in this case.  *See* Def. Mot. at 14; Pl. Mot. 19–21 (making no reference to legislative history).  The relevant conference report simply states that, under the provision ultimately enacted, "[t]he Secretary

language of Section 4410(b) requires the Secretary to impose the rural floor budget-neutrality

adjustment only on "hospitals not described" in Section 4410(a). *See* BBA 1997 § 4410(b)

(stating that the Secretary "shall adjust the area wage index referred to in subsection (a) for

hospitals not described in such subsection"). The parties dispute which hospitals are described in

subsection (a). That subsection provides:

> For purposes of [the wage index statute] . . . , the area wage index
> applicable under such section to any hospital which is not located in a
> rural area . . . may not be less than the area wage index applicable under
> such section to hospitals located in rural areas in the State in which the
> hospital is located.

*See* BBA 1997 § 4410(a). Plaintiffs insist that this language unambiguously describes "all rural

hospitals and all urban hospitals with a wage index below the rural floor," and the Secretary

therefore is forbidden from applying the budget-neutrality adjustment to such hospitals. *See* Pl.

Mot. at 19. Defendant disagrees, arguing that the statute is ambiguous as to whether it describes

rural hospitals. *See* ECF No. 26 (Defendant's Reply) at 6.

As an initial matter, the parties agree that the statute describes low-wage urban

hospitals.[13] Section 4410(a) applies the rural-floor adjustment to "any hospital which is not

located in a rural area," the wage index of which is "less than the area wage index applicable . . .

to hospitals located in rural areas in the State in which the hospital is located." *See* BBA 1997

§ 4410(a). This is an unambiguous description of the hospitals that receive the rural-floor

---

would be required to make any adjustments in the wage index in a budget neutral manner." *See* H.R. Conf. Rep. No. 105-217, 105th Cong., 1st Sess. at 712. In other words, the conference report makes clear that Section 4410(b) was intended to achieve budget neutrality, but it does not dictate how. As a result, this Court's analysis at Step One begins and ends with the statutory text.

[13]       The Secretary conceded in his Reply brief that subsection (a) at least describes low-wage urban hospitals that receive the rural-floor adjustment. *See* Def. Reply at 6 ("The parties agree that low-wage urban hospitals are 'described in' Section 4410(a)."). This was a retreat from the position that the Secretary took in his opening brief, where he argued that "[r]ead literally, Section 4410(a) describes two types of hospitals: those 'located in rural areas and those 'not located in a rural area.'" *See* Def. Mot. at 14. Under that reading, Section 4410(b)'s carveout would apply to all hospitals, which the Secretary explained "cannot ultimately be correct" because "Congress clearly intended to establish a budget neutrality adjustment that applied to at least some hospitals." *Id.* The Secretary thus initially argued that the statute is ambiguous as to all hospitals.

adjustment — *i.e.*, low-wage urban hospitals — making it clear that the budget-neutrality

adjustment required by Section 4410(b) may not be applied to such hospitals.  *See id.* § 4410(b)

("The Secretary . . . shall adjust the area wage index referred to in subsection (a) *for hospitals not*

*described in such subsection*." (emphasis added)).

The parties sharply dispute, however, whether the statutory language also "describes"

rural hospitals.  *See* Pl. Mot. at 19 (arguing that Section 4410(a) "exempts from the budget-

neutrality adjustment all rural hospitals"); Def. Reply at 5 ("Rural . . . hospitals are 'not

described in such subsection' and are therefore subject to the budget neutrality adjustment

required by Section 4410(b).").  At the very least, rural hospitals are referenced in Section

4410(a), which identifies the hospitals that receive the rural-floor adjustment as those with wage

indices "less than the area wage index applicable . . . to *hospitals located in rural areas* in the

State in which the hospital is located."  *See* BBA 1997 § 4410(a) (emphasis added).  In

describing low-wage urban hospitals, Section 4410(a) draws a comparison between the wage

index of "any hospital which is not located in a rural area" and those of "hospitals located in

rural areas."  *Id.*  The question is whether this language qualifies as a "description" of rural

hospitals.

"When a statute does not define a term, [courts] typically 'give the phrase its ordinary

meaning.'"  *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (quoting *Johnson v. United States,* 559

U.S. 133, 138 (2010)); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental

canon of statutory construction is that, unless otherwise defined, words will be interpreted as

taking their ordinary, contemporary, common meaning." (citation omitted)).  To determine a

word's ordinary meaning, courts start with the word's definition.  *See Taniguchi v. Kan Pac.*

*Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (using several dictionary definitions to establish the

ordinary meaning of a statutory term).  The *Merriam-Webster Dictionary* defines "describe" as "to represent or give an account of in words."  *See Describe*, *Merriam-Webster Dictionary* (2022); *see also Describe*, *Oxford English Dictionary* (2022) ("To portray in words."); *Describe*, *American Heritage Dictionary* (2022) ("To give any account of in speech or writing"). "Describe" may be distinguished from "mention" or "refer."  *Compare id.*, *with Mention*, *Merriam-Webster Dictionary* (2022) ("[T]he act or an instance of citing or calling attention to someone or something especially in a casual or incidental manner."), *and Mention*, *Oxford English Dictionary* (2022) ("[T]o refer to briefly and without entering into detail; to remark upon incidentally."), *and Refer*, *Merriam-Webster Dictionary* (2022) ("[T]o think of, regard, or classify within a general category or group."), *and Refer*, *Oxford English Dictionary* (2022) ("To submit or direct a person or thing to another.").

One way to read the reference to "hospitals located in rural areas" is as a "description" of rural hospitals:  The words arguably "represent" such hospitals.  *See* BBA 1997 § 4410(a).  That plausible construction of the statute is strongly advocated by Plaintiffs.  *See* Pl. Mot. at 19–21; ECF No. 23 (Plaintiffs' Opposition and Reply) at 3–5.  Importantly, this interpretation leads to the conclusion that the Secretary may not apply the budget-neutrality adjustment to either low-wage urban hospitals nor rural hospitals; and that would render the "iterative method" employed by the Secretary (which applies budget-neutrality adjustments to rural hospitals) unlawful.

But the Secretary proposes an alternative construction of the statute that is also plausible. *See* Def. Mot. at 14–17; Def. Reply at 5–7.  According to this alternative construction, the statute's reference to rural hospitals does not serve to describe those hospitals, but instead is used to describe the *wage index* applicable to those hospitals.  *Id.*  The statute uses the wage index of rural hospitals to define the rural floor — rural hospitals themselves are not the subject of the

statutory provision and are not described.  Instead, the provision describes only low-wage urban hospitals, but does so by comparing the wage indices of those hospitals with the wage indices of rural hospitals.  Under this reading of the statutory language, rural hospitals are merely "mentioned" or "referred to" in the description of low-wage urban hospitals; in other words, the statute does not "portray" or "give an account" of rural hospitals, but instead "cites" or "calls attention" to such hospitals in an "incidental manner."

Because the language of Section 4410(a) "can support [multiple] plausible interpretations," the statute is "ambiguous for purposes of *Chevron* analysis."  *See AFL–CIO*, 333 F.3d at 174 (citation omitted).  The statute can be read *either* as describing rural hospitals and low-wage urban hospitals *or* as describing only low-wage urban hospitals.  Section 4410(a) does not unambiguously describe rural hospitals, as Plaintiffs claim, and the statute therefore does not unambiguously forbid the Secretary from applying budget-neutrality adjustments to rural hospitals.  *See id.*

B.     The Secretary's Interpretation is Reasonable.

Having determined that Section 4410(a) is ambiguous as to which hospitals are "described," the Court must now determine whether the Secretary's interpretation of Section 4410 is permissible.  *See id.* at 173 (citing *Chevron*, 467 U.S. at 842–43).  As previously noted, the Secretary applied the budget-neutrality adjustment to rural and high-wage urban hospitals using a simplified form of the iterative model; and in FFY 2009 and 2010, the Secretary achieved budget neutrality within individual states instead of applying budget-neutrality adjustments nationwide.  *See supra*, Part I.B & C.  The Court examines each of these components of the Secretary's interpretation of Section 4410.

1.     <u>The Secretary's Application of Budget-Neutrality Adjustments to Rural Hospitals is Permissible</u>.

The Court defers to the Secretary's decision to apply the budget-neutrality adjustment to rural hospitals. As discussed, *supra*, there is more than one plausible way to read the statute's requirement that the Secretary asses the budget-neutrality adjustment against hospitals "not described" in subsection (a). When a statute is ambiguous, *Chevron* provides that Congress "has implicitly delegated the authority" to interpret the ambiguous term to the Secretary, and the Court must give deference to that interpretation. *See Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602, 617 (D.C. Cir. 2017). Here, the Secretary concluded that "rural hospitals are 'not described in' Section 4410(a) because their wage indices are not affected by [the] provision." *See* Def. Reply at 7. The Secretary reads Section 4410(a) to describe only the hospitals that receive the rural-floor adjustment, *i.e.,* low-wage urban hospitals; he has determined that the reference to rural hospitals is made only to identify the disparity in wage indices that the statute intends to correct. This is a permissible construction of the statute that is entitled to deference. *See Brand X*, 545 U.S. at 980 ("If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute." (citation omitted)).

Further, the Secretary "has reasonably explained how the permissible interpretation [he] chose is 'rationally related to the goals of' the statute." *See Vill. of Barrington*, 636 F.3d at 665 (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999)). He has identified Congress's intent "to address anomalous occurrences where certain urban areas in a State have unusually depressed wages when compared to the State's rural areas," *see* 73 Fed. Reg. at 48,572; and he has detailed how the application of the budget-neutrality adjustment to rural and high-wage urban hospitals ensures that the wage indices of low-wage urban hospitals are raised

to the rural floor in a budget-neutral way, *see* 72 Fed. Reg, at 47,325–29 (describing the iterative method); Def. Mot. 14–17; Def. Reply 5–7.  On this Court's deferential review, the Secretary has permissibly interpreted Section 4410 to allow the application of the budget-neutrality adjustment to rural hospitals.

> 2.      The Iterative Method is a Permissible "Manner" of Achieving Budget Neutrality.

Section 4410(b) specifically requires the Secretary to "adjust the area wage index" of certain hospitals "*in a manner* which assures that the aggregate payments made [for the rural-floor adjustment] in a fiscal year . . . are not greater or less than those which would have been made . . . if this section did not apply."  *See* BBA 1997 § 4410(b) (emphasis added).  As discussed, *supra*, the "manner" that the Secretary adopted to implement the budget-neutrality provision was the "iterative method."  Under the iterative method, the Secretary first raises the wage index for low-wage urban hospitals to the rural floor (thus raising aggregate payments), then lowers the wage indices for rural and high-wage urban hospitals to achieve budget neutrality (thus reducing the wage index for rural hospitals below the former rural floor).  Then, the Secretary lowers the wage index for low-wage urban hospitals to the newly defined rural floor. This reduces payments overall, so the Secretary raises the wage indices of non-rural floor hospitals to achieve budget neutrality.  Then he raises the wage index for low-wage urban hospitals to the newly defined rural floor, thus raising payments overall and beginning the iterative cycle again, continuing until the wage indices equilibrate to produce budget-neutral payments.  *See* 72 Fed. Reg. at 47,325–29.  The Secretary reads the statute "to allow an iterative calculation of budget neutrality and wage indices" because that "avoid[s] the apparent contradiction" of paying low-wage urban hospitals more than (and not just the same amount as) their rural counterparts.  *Id.* at 47,325.

The iterative method complies with Section 4410(b), which requires (1) the rural-floor adjustment to be budget-neutral; and (2) the assessment of any budget-neutrality adjustments to be made only on hospitals "not described" in the rural-floor provision — *i.e.*, on rural and high-wage urban hospitals.  The statute provides no further instruction on the "manner" of making these adjustments, leaving the Secretary to "gap-fill[] . . . '[any] difficult policy choices'" within the bounds of Section 4410.  *See Animal Legal Def. Fund*, 872 F.3d at 617 (quoting *Brand X*, 545 U.S. at 980); *Adirondack Med. Ctr. v. Sebelius*, 29 F. Supp. 3d 25, 41 (D.D.C. 2014), *aff'd sub nom. Adirondack Med. Ctr. v. Burwell*, 782 F.3d 707 (D.C. Cir. 2015) (interpreting statute directing Secretary to adjust calculation "in a manner" that is budget neutral as "a deferral to the Secretary's expertise in administering Medicare"); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (interpreting statute directing Secretary to "provide assistance . . . in a manner determined appropriate by the Secretary" as leaving "to the Secretary's sole judgment the determination of the manner for providing assistance").  The iterative method chosen by the Secretary unquestionably achieves budget neutrality; and it does so without requiring low-wage urban hospitals that receive the rural-floor adjustment to share in the costs of budget neutrality.  Under the iterative method, low-wage urban hospitals see changes in their payments only when the rural floor moves and their payments are adjusted to match the rural floor; the Secretary never reduces payments to low-wage urban hospitals to achieve budget neutrality.  Thus, it was well within the Secretary's discretion to select the iterative method to fulfill his statutory obligations under Section 4410.

Plaintiffs argue that the Secretary's iterative process essentially applies a budget-neutrality adjustment to low-wage urban hospitals (which Plaintiffs refer to as "rural floor hospitals"), and that this is impermissible.  *See* Pl. Opp. at 12.  According to Plaintiffs, the

Secretary's methodology "inevitably results in the budget neutrality adjustment for rural floor urban hospitals coming closer and closer to the budget neutrality adjustment for all others." *Id.* Plaintiffs contend that the Secretary should simply upwardly adjust the wage indices of low-wage urban hospitals to the rural floor, and then reduce the wage indices of rural and high-wage urban hospitals to achieve budget neutrality. *Id.* Without any iterative adjustments, this alternative method would leave the low-wage urban hospitals with higher wage indices than those of the rural hospitals that set the original benchmark but then had their wage indices lowered to achieve budget neutrality. *Id.*; Pl. Mot. at 22–23. Plaintiffs contend that such a result would be consistent with Congress's intent to increase payments to low-wage urban hospitals; they further argue that any decrease in payments to low-wage urban hospitals (under the iterative method or otherwise) would be contrary to Congress's intent. *See* Pl. Mot. at 18, 22.

Although Plaintiffs oppose the iterative method and favor an alternative procedure that would benefit them, nothing in Section 4410 commands the Secretary to adopt their preferred approach. As the Secretary notes, a "result that elevated low-wage urban hospitals above the rural floor would be plainly at variance with the policy of Section 4410 as a whole, which was designed to raise the indices of low-wage urban hospitals to the index actually received by their state's rural hospitals, and no higher." *See* Def. Reply at 9 (citing 72 Fed. Reg. at 47,325 (explaining that "such a reading would not be in accordance with Congressional intent, which was to set a floor for urban hospitals, not to pay [low-wage] urban hospitals a wage index higher than the wage index applicable to rural hospitals")). Section 4410 requires only that the Secretary refrain from applying the budget-neutrality adjustments to low-wage urban hospitals — and, as discussed, *supra*, the iterative method does not run afoul of this mandate. Properly

understood, the iterated adjustments to the wage indices of low-wage urban hospitals are not
budget-neutrality adjustments at all, but instead are rural-floor adjustments.

>    3.    It was Permissible for the Secretary to Employ a Simplified Version of the
>          Iterative Method.

Plaintiffs correctly point out that the Secretary ultimately did not use the iterative
method:  Because the iterative calculations were cumbersome, the Secretary instead applied a
uniform percentage to all hospitals — including low-wage urban hospitals — that approximated
the result of applying the iterative method.  *See* Pl. Mot. at 23; 72 Fed. Reg. at 47,325.  Indeed,
the Secretary "determined that the iterative method is substantively equivalent to simply
adjusting all area wage indices by a uniform percentage."  *See* 72 Fed. Reg. at 47,325.  Since
FFY 2008, therefore, the Secretary has applied a simplified methodology whereby he first raises
the wages indices of low-wage urban hospitals to the rural floor and then applies a uniform
percentage to decrease the wage indices of all hospitals to achieve budget neutrality.  *Id.*
Plaintiffs argue with some force that under this simplified method, the Secretary has
impermissibly applied "a uniform nationwide budget neutrality factor" to all hospitals —
including low-wage urban hospitals — which constitutes an "unreasonabl[e] deviat[ion] from the
statutory text."  *See* Pl. Mot. at 23.

The Court has considered this argument carefully, but ultimately is not persuaded.  At
first glance, it does appear that the Secretary is applying a budget-neutrality adjustment to low-
wage urban hospitals, which would directly violate Section 4410.  *See supra* at I.A (noting that
Section 4410(b) prohibits applying the budget-neutrality adjustment to hospitals "described" in
subsection (a), and that low-wage urban hospitals are "described" in subsection (a)).  To be sure,
the simplified method employed by the Secretary results in a direct reduction of payments to
low-wage urban hospitals, at a fixed percentage that is also applied to other hospitals.  But this

reduction of payments to low-wage urban hospitals is not through application of the budget-neutrality adjustment.  Rather, the simplified methodology adopted by the Secretary is just another way of applying the iterative method, which complies with Section 4410 because it applies only the rural-floor adjustment to low-wage urban hospitals.  *See supra*, at I.B.2 (under the iterative method, "low-wage urban hospitals see changes in their payments only when the rural floor moves and their payments are adjusted to match the rural floor; the Secretary never reduces payments to low-wage urban hospitals to achieve budget neutrality").  The key here is that the simplified method is just another way of applying the permissible iterative method — the percentage applied under the simplified method yields results that are "substantively identical" to applying the iterative method.  *See* 72 Fed. Reg. at 47,325.  With that understanding, it would be hyper-technical and ineffectual to prohibit the Secretary from using the simplified form of the iterative method.  Indeed, if this Court were to remand this case for the Secretary to apply the more complicated version of the iterative method, Plaintiffs' Medicare reimbursements would be exactly the same.  *Id.* (explaining how the simplified method is derived from the iterative method and noting that the simplified method "is accomplished more quickly, is less complex, and *arrives at the same final wage index values*" (emphasis added)).  The Secretary also lists valid reasons for using the simplified method, namely that the schedule for setting reimbursement "is relatively condensed" such that "it would not be practical to require such multiple layers of calculations, when a uniform adjustment would produce substantively identical results."  *Id.* Accordingly, the Secretary's utilization of the simplified version of the iterative method does not violate Section 4410 and is within his discretion.

4.      The Achievement of Budget Neutrality on a State-by-State Basis was
Permissible.

Plaintiffs argue that the Secretary's application of the budget-neutrality adjustment on a

state-by-state basis, rather than nationwide, was an unreasonable interpretation of Section 4410.

*See* Pl. Mot. at 23–25; Pl. Opp. at 13–17.[14]  An agency's interpretation of a statute is permissible

if it "is logically consistent with the language of the regulation and it serves a permissible

regulatory function." *Rollins Envtl. Servs., Inc. v. EPA*, 937 F.2d 649, 652 (D.C. Cir. 1991); *see*

*also Mayo Found. Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011) (holding that

an agency's construction is permissible "unless it is arbitrary or capricious in substance, or

manifestly contrary to the statute" (cleaned up)).  In the FFY 2009 Proposed Rule, the Secretary

explained that he intended to alter the budget-neutrality adjustment to employ a state-by-state

calculation because the rural floor had been "creating a benefit for a minority of States that is

then funded by a majority of States, including States that are overwhelmingly rural in character."

*See* 73 Fed. Reg. at 23,622.  He further explained that "[t]he intent behind the rural floor seems

to have been to address anomalous occurrences where certain urban areas in a State have

unusually depressed wages when compared to the State's rural areas;" and because these

discrepancies "occur at the State level, we believe it also would be sound policy to make the

budget neutrality adjustment specific to the State, redistributing payments among hospitals

within the State, rather than adjusting payments to hospitals in other States." *Id.* at 23,622.  After

---

[14]      As Defendant notes in his Reply brief, it is unclear whether Plaintiffs have conceded their argument that the
in-state application of the budget-neutrality adjustment was impermissible.  *See* Def. Reply at 13 ("Although the
plaintiff hospitals challenged the Secretary's statutory authority to apply the in-state budget neutrality adjustment,
they seem to have backed away from that challenge on reply." (internal citations omitted)).  At oral argument on the
instant motions, however, Plaintiffs' counsel stated that Plaintiffs are still challenging the state-by-state application
of the budget-neutrality provision, even though that is not their principal argument.  *See* Transcript of Oral
Argument at 68–69, *St. Mary Medical Center, et. al. v. Azar*, No. 17-cv-1073 (Jan. 30, 2020).

notice and comment, the Secretary reiterated this explanation in the final rulemaking.  *See* 73 Fed. Reg. at 48,752.

The Secretary's reasoning reflects an interpretation of Section 4410 that is consistent with the language of the statute and serves a permissible regulatory function.  He rationally considered the purpose of the rural-floor and the budget-neutrality adjustments and decided that the goals of the regulations would be best served by resolving discrepancies between the rural hospitals and the "depressed wages" at urban hospitals in each individual state, rather than spreading the costs of the budget-neutrality provision over a nationwide pool of hospitals.  That determination was not arbitrary, nor capricious, nor manifestly contrary to the goals of Medicare or Section 4410.

Plaintiffs focus their argument on the alleged inadequacy of the Secretary's reasoning, noting that the Secretary failed to explain why the creation of a benefit for a minority of states is a legitimate concern that should be addressed, and that the Secretary failed to provide any evidence for the "facially absurd" gaming scheme.  *See* Pl. Opp. 15–16.[15]  Although Plaintiffs do not agree with the Secretary, they have not demonstrated that his reasons for adopting the in-state approach were arbitrary or capricious.  The Secretary stated his view that "for all providers, the within-State budget neutrality policy is more equitable than the national adjustment because it concentrates the budget neutrality at the State level for a statutory provision that applies benefits

---

[15]     Plaintiffs also argue that Congress's direction in the Medicare Improvements and Extension Act of 2006 that the Secretary "consider . . . [m]inimizing variations in wage index adjustments between and within [geographical areas]" shows that "Congress was concerned about excessive variations in wage [indices] among states."  *See* Pl. Opp. at 16 (quoting Medicare Improvements and Extension Act of 2006, Division B of the Tax Relief and Health Care Act of 2006, Pub. L. No. 109-432, div. B, tit. I, § 106(b)(2)(D), 120 Stat. 2922, 2982.  According to Plaintiffs, this means that the Secretary's in-state policy, which they claim increases variation, is unreasonable.  The Court is not convinced.  First, Congress directed the Secretary to "consider" minimizing variations, which the Secretary asserts he has.  *See* Def. Mot. at 21–22.  Second, in interpreting Section 4410, the Secretary is guided by the language of the statute and service of a permissible regulatory function.  *See Rollins Envtl. Servs. Inc.*, 937 F.2d at 652.  Nothing in Congress's later directive modifies the language of the statute or prohibits the regulatory function relied upon by the Secretary.

at the State level."  *See* 73 Fed. Reg. at 48,574.  Section 4410 allows the Secretary to make policy choices such as this one when implementing the statute's requirements, *see Amgen Inc. v. Hargan*, 285 F. Supp. 3d 351, 371 (D.D.C. 2018) (explaining that when interpretation of a statute "implicates the type of policy-laden judgment that is better left to the politically accountable executive branch," courts should defer to agencies because it is "precisely the type of statutory gap-filling that involves difficult policy choices that agencies are better equipped to make than courts" (quoting *Animal Legal Def. Fund*, 872 F.3d at 617)).

Finally, Plaintiffs contend that the Secretary's in-state application of the budget-neutrality provision is prohibited by the text of Section 4410:  According to Plaintiffs, the statute's requirement that the budget-neutrality assessments be made against hospitals "not described" in subsection (a) means "*all* hospitals not described," *i.e.*, all hospitals in the country.  *See* Pl. Mot. at 21 (emphasis in original).  Plaintiffs' reading of Section 4410 to require a nationwide budget-neutrality adjustment is far from clear and unambiguous.  As previously discussed, the statute appears to address categories of hospitals without any consideration of their geographic location. *See, supra,* Part I.A.  Accordingly, under *Chevron*, the Secretary's reasonable interpretation of the statute and his application of the in-state budget-neutrality adjustment are entitled to deference.  *See Brand X*, 545 U.S. at 980 (citing *Chevron*, 467 U.S. at 843–44 & n.11).

For all the foregoing reasons, the Secretary lawfully applied the budget-neutrality adjustment to rural hospitals and high-wage urban hospitals, using a simplified version of the iterative method, on a state-by-state basis, in FFYs 2009 and 2010.

## II.  Challenges to the Rulemaking Process

Plaintiffs allege that the Secretary violated the APA in adopting and implementing regulations to apply the rural-floor and budget-neutrality provisions.  Plaintiffs contend that the

rule applied in FFYs 2009 and 2010 should fall because the Secretary did not provide adequate notice of the in-state budget-neutrality adjustment and did not adequately respond to comments about the proposed rule.  *See* Pl. Mot. at 25–32.

    A.    <u>Adequacy of Notice</u>

Plaintiffs first contend that the Secretary violated the APA because the FFY 2009 Proposed Rule "did not adequately describe 'the terms or substance of the proposed rule or a description of the subjects and issues involved;'" and it therefore "foreclosed criticism or formulation of possible alternatives."  *See* Pl. Mot. at 25–26 (quoting 5 U.S.C. § 553(b)(3)). Specifically, Plaintiffs allege that the proposed rule failed to explain how the Secretary had calculated the statewide adjustment, failed to describe the range of alternatives the Secretary had considered, and did not provide a comparison of wage index values under the existing policy and the proposed policy.  *Id.* at 26–29.

The APA requires an agency to publish "notice" of "either the terms or substance of the proposed rule or a description of the subjects and issues involved," in order to "give interested persons an opportunity to participate in the rulemaking."  *See* 5 U.S.C. § 553.  "Longstanding precedent instructs that notice is sufficient if it affords interested parties a reasonable opportunity to participate in the rulemaking process, and if the parties have not been deprived of the opportunity to present relevant information by lack of notice that the issue was there."  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 236 (D.C. Cir. 2008) (cleaned up); *see Fla. Power & Light Co. v. Nuclear Regulatory Comm'n*, 846 F.2d 765, 771 (D.C. Cir. 1988).

Although Plaintiffs provide a litany of particulars that they would have liked the Secretary to include in his notice of proposed rulemaking, the APA requires only that the agency provide sufficient information such that parties have "a reasonable opportunity to participate in

the rulemaking process." *Am. Radio Relay League*, 524 F.3d at 236.  In this instance, the

Secretary provided clear and adequate notice of his intent "to apply a State level rural floor

budget neutrality adjustment to the wage index beginning in [FFY] 2009."  *See* 73 Fed. Reg. at

23,622.  In the FFY 2009 Proposed Rule, the Secretary explained that the method of calculation

described in the FFY 2008 Final Rule would apply within each state rather than nationwide.  *See*

72 Fed. Reg. at 47,325–29 (detailing the rural-floor and budget-neutrality calculations); 73 Fed.

Reg. at 23,622–23 (explaining that "States that have no hospitals receiving a rural floor wage

index would no longer have a negative budget neutrality adjustment applied to their wage

indices," while "hospitals in States with hospitals receiving a rural floor would have their wage

indices downwardly adjusted to achieve budget neutrality within the State").  The Secretary

provided (1) a breakdown of the estimated payments hospitals in each state would receive under

the then-current nationwide policy and the proposed in-state policy, *see* 73 Fed. Reg. at 23,620–

21; (2) a chart showing the anticipated percentage differential of the two policies in each state,

*id.* at 23,622; and (3) a clear explanation for the policy change, *id.* at 23,620 (noting that the

nationwide budget-neutrality adjustment meant that "urban hospitals that qualify for their State's

rural floor wage index receive enhanced payments at the expense of all rural hospitals

nationwide and all other urban hospitals that do not receive their State's rural floor"); *id.* at

26,622 (explaining that the in-state policy would limit the opportunistic activities of some

hospitals opting into the IPPS system to increase a state's rural floor).  The information provided

by the Secretary was sufficient to "afford[] interested parties a reasonable opportunity to

participate in the rulemaking process," and did not "deprive[] [parties] of the opportunity to

present relevant information by lack of notice that the issue was there.'"  *Am. Radio Relay*

*League, Inc.*, 524 F.3d at 236 (citation omitted).

Plaintiffs' claim of inadequate notice is belied by the record.  Notably, the Secretary's notice of proposed rulemaking elicited public comments directed at the very issues raised by Plaintiffs — the calculation of the statewide adjustment and the alternative of retaining the practice of applying a nationwide adjustment.  *See First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (finding record of comments on subjects complained of by plaintiffs to constitute evidence that sufficient notice-and-comment process was undertaken).  Although Plaintiffs contend that "[t]he Secretary's proposed rule did not explain how he calculated [the] proposed within-state budget neutrality adjustment," *see* Pl. Mot. at 26, the record contains numerous, in-depth, public comments about the calculations in the FFY 2009 Proposed Rule. *See* ECF Nos. 28 & 29 (Administrative Record), 1214, 1519–20, 6559–60, 6573–74 (public comments describing and critiquing calculations in proposed rule).  Similarly, while Plaintiffs assert that the Secretary's proposed rule did not "describe the range of alternatives [he] considered," *see* Pl. Mot. at 26, the record is replete with comments urging the Secretary to retain the nationwide policy — an obvious alternative to adopting the new rule.  *See* A.R. 5141 (public comment urging the Secretary to "apply the rural floor budget-neutrality adjustments on a nationwide basis") *and* A.R. 4963, 4969, 5014 (same).  As is evident from the public comments, the proposed rule clearly explained the Secretary's intent to apply an in-state budget-neutrality adjustment:  Contrary to Plaintiffs' argument, many hospitals were able to predict and comment upon the impact of that adjustment, based on the Secretary's notice, *see, e.g.*, A.R. 1395, 6498, 6510, 6513–14, 6568 (public comments specifically estimating the negative impact of the policy change on individual hospitals, using the Secretary's calculations).

Equally unavailing is Plaintiffs' final contention that "[t]he Secretary revealed the basic methodology for determining the adjustment but not the data that he used to calculate the

adjustments," such that individual hospitals "were deprived of information sufficient to evaluate the economic impact of the proposed" rule.  *See* Pl. Opp. at 17–18; Pl. Mot. at 27 ("[T]he Secretary did not include a table of wage [indices] using the nationwide budget neutrality adjustment.").  Although Plaintiffs would have preferred additional information, the level of detail that they demand is unwarranted.  As Defendant points out, "[a]n administrative agency has no obligation to individually identify each winner and loser from a given proposal, much less quantify the winnings or losses."  *See* Def. Reply at 16.  The Court's inquiry focuses only on whether "the interested parties could not reasonably have anticipated the final rulemaking from the draft rule," and "whether the notice given affords exposure to diverse public comment, fairness to affected parties, and an opportunity to develop evidence in the record."  *Nat'l Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 530–31 (D.C. Cir. 1997) (cleaned up).  As previously discussed, the process followed by the agency complied with the enumerated requirements.

On this record, the Court concludes that no parties have been "deprived of the opportunity to present relevant information" and that the notice provided by the Secretary was "sufficient [to] afford[] interested parties a reasonable opportunity to participate in the rulemaking process."  *See Am. Radio Relay League, Inc.*, 524 F.3d at 236.

B.    Adequacy of Response to Comments

Plaintiffs also argue that the Secretary violated the APA because he failed to adequately address public comments.  *See* Pl. Mot. at 29–32; Pl. Opp. at 19–23.  APA Section 553 requires agencies to provide the public with notice of a proposed rulemaking, an opportunity to comment, and "[a]fter consideration of the relevant matter presented," a "concise general statement" of the rule's basis and purpose.  *See* 5 U.S.C. § 553.  The D.C. Circuit has made clear that "the

opportunity to comment is meaningless unless the agency responds to significant points raised by the public." *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C. Cir. 1977), *cert. denied*, 485 U.S. 959 (1988); *see also Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012).  That said, the notice-and-comment provision of the APA, *see* 5 U.S.C. § 553(c), "has never been interpreted to require [an] agency to respond to every comment, or to [analyze] every issue or alternative raised by comments, no matter how insubstantial." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (citation omitted).  Rather, the agency need respond only to those "comments which, if true, . . . would require a change in an agency's proposed rule." *Home Box Office, Inc.*, 567 F.2d at 35 n.58.

Plaintiffs raise two main points.  First, Plaintiffs generally highlight that "the majority of commenters, including most national and State hospital associations, did not support the proposal to apply a State level budget neutrality adjustment for the rural [floor]." *See* 73 Fed. Reg. at 48,573; *see also* Pl. Mot. at 30–31; Pl. Opp. at 21.  According to Plaintiffs, the Secretary's response to this "thoroughgoing assault" was insufficient because he provided "only a few 'unedifying' comments." *See* Pl. Mot. at 31 (citing *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1167 (D.C. Cir. 1987).[16]  In the final rule, however, the Secretary acknowledged the widespread dissatisfaction with the in-state policy and provided a detailed explanation of his decision to adopt it notwithstanding its unpopularity.  *See* 73 Fed. Reg. at 48,573–74 (explaining that the nationwide policy "requires hospitals nationwide to fund an adjustment to the Medicare payment system to address unrelated situations in a minority of States").  The Secretary also

---

[16]     Plaintiffs attempt to bolster their case by contextualizing it "against the backdrop of the Secretary's other widespread errors in calculating the rural floor budget neutrality adjustment and his refusal to respond generally to criticisms of his policies during the FFY 2009 rulemaking period."  *See* Pl. Opp. at 19 (citing *Cape Cod Hosp.*, 630 F.3d 203).  Plaintiffs appear to argue that because the D.C. Circuit previously remanded a case concerning Medicare payments for inpatient services due to the Secretary's insufficient response to comments, this Court should do the same.  The Court declines Plaintiffs' invitation to consider the adequacy of the Secretary's response to comments about other 2009 policy changes that are not before this Court.

responded to the expressed concerns by "phas[ing] in, over a 3-year period, the transition from the national budget neutrality adjustment to the State level budget neutrality adjustment."  *Id.* Plaintiffs counter that this "purported response" is "inadequate" because the Secretary did not "address the financial hardship that the within-state rural floor budget neutrality adjustment would place on hospitals in the affected states whether implemented immediately or through a three-year transition period."  *See* Pl. Opp. at 21–22.  The Court disagrees.  In the final rule, the Secretary directly "[took] into account the potentially drastic payment cuts that may occur to hospitals in some States," and explained that the three-year phasing-in period was meant to ease the transition to the new system.  *See* 73 Fed. Reg. at 48,574.[17]  Although Plaintiffs would have strongly preferred for the Secretary to change his position and abandon the in-state policy, the Secretary was obligated only to "respond[] to significant points raised by the public," *Home Box Office*, 567 F.2d at 35–36, and to describe "how the agency resolved any significant problems raised," *Rodway v. Dep't of Agric.*, 514 F.2d 809, 817 (D.C. Cir. 1975).  The Secretary met that obligation.

Plaintiffs also argue that the Secretary entirely failed to address four concerns raised by comments, specifically that the in-state rural floor budget-neutrality adjustment would:  (1)

---

[17]     In describing the calculations made to implement the phased-in budget-neutrality adjustments, the Secretary noted that "in order to ensure that national payments overall remain budget neutral after application of the rural and imputed floor, an additional adjustment factor of 0.999923 must be applied to the blended wage [indices]." *See* 73 Fed. Reg. at 48,762.  Plaintiffs argue that the Secretary provided no notice whatsoever of this additional adjustment.  *See* Pl. Mot. at 21; Pl. Opp. at 18.  But this additional adjustment was part of the plan to use blended wage indices during the three-year transition period, which was adopted in response to comments.  *See* 73. Fed. Reg. at 48,574 ('[I]n response to the public's concerns . . . we have decided to phase in, over a 3-year period, the transition from the national budget neutrality adjustment to the State level budget neutrality adjustment.").  The Secretary, therefore, could not have provided notice of the additional adjustment because the phase-in was not contemplated in the originally proposed rule.  *See* 73 Fed. Reg. at 23,620–23; *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058 (D.C. Cir. 2000) ("[N]otice requirements do not require that the final rule be an exact replication of the proposed rule. If that rigidity were required, . . . [a]gencies would either refuse to make changes in response to comments or be forced into perpetual cycles of new notice and comment periods.").

"increase[] variations among wage [indices]," *see* Pl. Mot. at 31–32 (citing A.R. 2257); Pl. Opp. at 22–23 (citing A.R. 888, 2258, 2261, 6027–28); (2) "result in treatment of rural hospitals differently based on the state in which they are located," *see* Pl. Opp. at 23; (3) place "undue hardship and burden on hospitals with a greater number of Medicare beneficiaries," *id.*; and (4) cause "drastic swings in hospital reimbursement," *id.*  Contrary to Plaintiffs' first concern, the Secretary directly acknowledged that the rule change would result in "increased variations among wage [indices]," but explained that those variances simply reflected the underlying wage variations within states and did not justify a national budget-neutrality adjustment.  *See* 73 Fed. Reg. at 48,573.  As for the other comments raised by Plaintiffs, the Secretary made clear in both the proposed rule and the final rule that the policy change would benefit some hospitals while burdening others; indeed, the redistribution of the benefits and burdens of budget neutrality was the intended purpose of the change.  *See* 73 Fed. Reg. at 48,573 (explaining that the nationwide policy requires all hospitals "to fund an adjustment to the Medicare payment system to address unrelated situations in a minority of States"); *id.* at 48,571–72 (tables and charts demonstrating the net effect of the policy change on hospitals in different states); 73 Fed. Reg. at 23,620–23 (noting that "urban hospitals that qualify for their State's rural floor wage index receive enhanced payments at the expense of all rural hospitals nationwide and all other urban hospitals that do not receive their State's rural floor").  Thus, comments that the policy change would greatly change the payments received by some hospitals, though obviously true, "would [not] require a change in [the] agency's proposed rule," *see ACLU*, 823 F.2d at 1581, and thus did not require any additional response.

In any event, "[f]ailure to respond [to comments] is not grounds for APA invalidation unless the points raised in the comments were sufficiently central that agency silence would

demonstrate the rulemaking to be arbitrary and capricious." *National Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 188 (D.C. Cir. 1988).  Plaintiffs have made no showing here that the Secretary's alleged silence on the particular points raised constituted arbitrary and capricious action.  The record reflects that the Secretary addressed the differential treatment of hospitals under the new policy by phasing in the proposed change over time; the Secretary was not obligated to address every specific comment that touched upon this issue. *See Thompson*, 741 F.2d at 408 (holding that an agency is not required "to respond to every comment, or to [analyze] every issue or alternative raised by comments, no matter how insubstantial").  Accordingly, the Court rejects Plaintiffs' challenge to the Secretary's rulemaking process.

## CONCLUSION

For the foregoing reasons, the Court will deny Plaintiffs' Motion for Summary Judgment and will grant Defendant's Cross Motion.  A separate Order will issue this day.

_____
Florence Y. Pan
United States District Judge

Date:   January 20, 2022